IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CITGO PETROLEUM CORPORATION,

                Plaintiff,

      v.

RANGER ENTERPRISES, INC.,

                Defendant.

OPINION AND ORDER

07-cv-657-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

For almost fifteen years, plaintiff Citgo Petroleum Corporation sold petroleum products to defendant Ranger Enterprises, Inc. under a distributor franchise agreement. Under separate branding agreements, plaintiff Citgo paid the initial costs of "branding" each of 39 gas stations owned by defendant and provided branding incentives in the form of rebates on gallons of gas sold. The relationship started unraveling in 2005 and came to an end the following year.

In this lawsuit, plaintiff contends that defendant breached the parties' franchise agreement when it failed to purchase certain fuel allotments and breached the parties' branding agreements when it de-branded before the termination of the agreements. For its part, defendant contends that plaintiff breached the franchise agreement when it failed to

1

supply required fuel allotments.    Plaintiff asks the court to find as a matter of law that  (1) defendant breached the parties' franchise agreement when it failed to purchase the required monthly minimum fuel between January and July of 2006; (2) defendant breached the branding agreements by de-branding 39 of its stations before July 31, 2006; (3) plaintiff's claims are not barred by the doctrines of prior material breach, frustration of purpose, impossibility of performance and accord and satisfaction or because the liquidated damages clause imposes an improper penalty; (4) plaintiff is not liable for any breach of the franchise agreement and defendant is not entitled to damages for the loss of its ability to use plaintiff's brand; and (5) plaintiff is entitled to fees and prejudgment interest as prevailing party in this suit.

I conclude that defendant breached the franchise agreement when it failed to purchase the minimum monthly amounts it had agreed to buy under the agreement and that this failure is not excused by any alleged failures by plaintiff to supply gas in 2005, although defendant may be entitled to recover any costs it incurred that year in covering shortages in supplies from plaintiff.  I conclude also that under the branding agreements, defendant is liable for the cost of branding and for rebates it accepted for each of the 39 gas stations at issue in the amount of $3,071,147.08, and is not entitled to any damages for the costs of de-branding, re-branding, lost opportunity costs or lost opportunities for growth.  Plaintiff's alleged supply failures do not excuse payment of these amounts because defendant agreed

2

to pay them back to plaintiff if it de-branded its stations *for any reason*, because the obligation to repay the branding costs and incentives is separate from the duty to supply imposed on plaintiff under the franchise agreement and because, even if the franchise agreement applied to the branding obligations, defendant has failed to show any material breach of that agreement by plaintiff.  Plaintiff's claims are not barred by any of the doctrines defendant has asserted; the liquidated damages provision is not a prohibited penalty; defendant is not entitled to damages for the loss of use of plaintiff's brand; and plaintiff is entitled to fees and prejudgment interest in an amount to be determined at trial.  However, plaintiff is not entitled to summary judgment on defendant's counterclaim for breach of contract for undersupply in 2005.  Defendant did not waive its right to sue for damages for the shortfalls in supply when it executed an amendment to the franchise agreement in December 1, 2005.

The parties have filed a number of additional non-dispositive motions:  (1) plaintiff's motion to strike the errata testimony of Daniel Arnold, Frank Louis and John Carabelli, which will be granted as to Arnold's and Louis's testimony; (2) plaintiff's motion to strike the supplemental expert report of Jeffrey Bernard, which will be granted because the report is an improper attempt by Bernard to enlarge upon his original report; (3) defendant's motion for leave to supplement the record with the expert reports of Kevin Murphy, Joseph Leto and Dileep Sirur, which will be granted; (4) defendant's motion to strike portions of Dileep Sirur's report, which will be granted with respect to ¶¶ 13-22; and (5) defendant's

3

motion for leave to amend its answer to assert an additional affirmative defense, which will be denied.

Left for trial are (1) the measure of plaintiff's damages for defendant's breach of the franchise agreement for failing to purchase the required fuel in 2006 and (2) whether plaintiff breached the parties' franchise agreement in 2005 by failing to deliver the full amounts of product due under the franchise agreement and, if so, what damages defendant incurred.

## I. PRELIMINARY MOTIONS

### A.   Motion to Strike Errata Testimony

Plaintiff has filed a motion to strike the errata sheets submitted by defendant for three of its 30(b)(6) witness and to impose sanctions under Rule 37 because the errata sheet corrections exceed the boundaries of permissible corrections by changing the scope of the witnesses' testimony.  During the depositions of defendant's witnesses Frank Louis and Dan Arnold, plaintiff's counsel asked them the basis for their testimony that plaintiff had not delivered its promised supply of product during the second quarter of 2005.  Initially, both witnesses identified a document written by Bob McDonald regarding certain fuel shortages. In the course of Arnold's deposition, it was discovered that the document in question referred to shortages in 2003, not 2005.  Upon recognizing their mistake, defendant's

4

witnesses submitted errata sheet testimony striking their testimony regarding the McDonald letter and including new evidence in support of defendant's claim.  Plaintiff objects to defendant's errata sheets as an improper attempt to rewrite these witnesses' testimony.  (As for the third witness, John Carabelli, plaintiff has not identified any objectionable changes.)

Rule 30(e) allows changes in the form or substance of deposition testimony if the deponent submits a signed statement listing the changes and the reasons for making them. Defendant's witnesses have all complied with this requirement.  The question is whether Rule 30(e) encompasses all changes in substance, including such a significant change as Arnold and Louis have made.  Under Thorn v. Sundstrand Aerospace Corp., 207 F.3d 383, 389 (7th Cir. 2000), the answer seems to be no.

Thorn was an age discrimination case in which a deponent testified on behalf of the employer that in choosing which employees would be laid off, he had considered which had the "longest-term potential."  Later, he corrected his testimony in an attempt to show that he intended to refer to those employees who were working with *products* that had the "longest-term potential."  The court of appeals found the change permissible under the rule, noting that it covers changes in both form and substance and that it includes the salutary requirement that the original testimony and the proposed change be retained, thereby allowing the jury to evaluate both at trial.  If this were all that the court had said, I would agree with defendant that plaintiff's motion to strike should be denied and the jury allowed

5

to decide which version of the deponents' testimony it chose to believe.  However, the court went on to say that "[we] also believe, by analogy to the cases which hold that a subsequent affidavit may not be used to contradict the witness's deposition, that a change of substance which actually contradicts the transcript is impermissible unless it can plausibly be represented as the correction of an error in transcription, such as dropping a "not." Id. at 389 (internal citations omitted).

It is one thing to seek a correction when one meant to say something other than what he actually said, as was the case with the deponent in Thorn; it is another thing entirely to add new testimony based on new evidence, as Louis and Arnold want to do.  They may not provide new testimony under the guise of correcting errors.  Plaintiff's motion to strike will be granted.

Plaintiff has asked for sanctions in the form of an order barring defendant from adducing any evidence about fuel shortages during the second quarter of 2005, which was the subject of the attempted correction.  The motion will be granted.  Defendant's failure to catch the error in the testimony of the two witnesses had a prejudicial effect on plaintiff that could have been minimized if defendant's counsel had asked deponent Arnold appropriate questions after the error was discovered and, of course, it could have been eliminated altogether had defendant prepared its witnesses properly.  The prejudice could be cured by allowing plaintiff an opportunity to re-depose the two witnesses at defendant's expense, but

6

given the relative immateriality of the testimony, I am unwilling to impose such an inconvenience on plaintiff.  Defendant is not seeking any damages for any alleged undersupply in the second quarter; presumably, its only interest in putting in the evidence of the second quarter undersupply is to suggest to the jury that it continued into the third and fourth quarters of 2005.

Plaintiff is entitled to motion for attorney fees and costs incurred in bringing the motion in an amount to be decided after trial.

### B. Motions to Strike & Supplemental Expert Reports

#### 1. Plaintiff's motion to strike the supplemental expert report of Jeffrey Bernard

Jeffrey Bernard's supplemental expert report, dkt. #144,  includes opinions on topics that he failed to address in his original report.  Arguing that the supplementation is justifiable, defendant says it was necessary because plaintiff did not comply with certain discovery requirements and that the new report does not prejudice plaintiff.

In this court's amended pretrial conference order issued on January 23, 2008, the magistrate judge explained to the parties that

> [a]ll disclosures mandated by this paragraph must comply with the requirements of Rule 26(a)(2)(A), (B) and (C).  There shall be no third round of rebuttal expert reports.  Supplementation pursuant to Rule 26(e)(1) is limited to matters raised in an expert's first report, must be in writing and must be served not later than five calendar days before the expert's deposition, or

7

> before the general discovery cutoff if no one deposes the expert. . . . Failure to
> comply with these deadlines and procedures could result in the court  striking
> the testimony of a party's experts pursuant to Rule 37.  The  parties may
> modify these deadlines and procedures only by unanimous agreement or by
> court order.

Dkt. #29 at 2.  By court order, initial expert reports were due April 24, 2009; responsive

reports were due May 29, 2009.  Dkt. #86.

On May 30, 2009, defendant submitted Bernard's supplemental report without leave

of the court.  By defendant's own admission, the report contains additional opinions intended

to rebut the deposition testimony of plaintiff's 30(b)(6) witness, Brian Galloway, regarding

"ratability," or whether defendant was a sporadic purchaser of fuel, and plaintiff's allocations

during Hurricanes Rita and Katrina.   With respect to Bernard's supplement regarding

"ratability," defendant states that "Bernard's supplementation on ratability was proper, as he

considered Galloway's testimony, and also considered the testimony of other witnesses who

were not deposed until after April 20, 2009."  Dkt. #152 at 8-9.  With respect to plaintiff's

allocation of fuel during the hurricanes, defendant contends that plaintiff "had no legitimate

expectation that Galloway's opinion testimony could not be disputed . . . .; [o]bviously it

made more sense for Bernard to issue his supplemental expert containing this rebuttal on

May 29."  Dkt. #152 at 13.

Under Fed. R. Civ. P. 26(e)(1), a party may supplement or correct its Rule 26(a)

disclosures "if the party learns that in some material respect the disclosure or response is

8

incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." That is not the case here. Bernard's supplemental report seeks to rebut deposition testimony rather than to add information not otherwise made known.   Defendant contends that it is prejudiced by its inability to rebut Galloway's deposition testimony, but it  has only itself to blame for any discovery problems.  If at any time it had believed it lacked discovery relevant to ratability or fuel allocations, it could have filed a motion to compel discovery.  It never did so.  Now it seeks to adduce new materials by way of supplement to which plaintiff cannot respond.  Defendant could have asked for leave of court to file a supplemental report in which Bernard responded to Brian Galloway's deposition testimony.  Had it done so, the court might have allowed the supplementation and given plaintiff an opportunity to respond.  It is too late to do so now.  At trial, defendant  may challenge Galloway's testimony but it may not offer any new opinions by Bernard.


2. Defendant's motion for leave to supplement the record with expert testimony of Kevin Murphy, Dileep Sirur and Joseph Leto and to strike portions of the expert testimony of Dileep Sirur

Plaintiff does not oppose defendant's June 15, 2009, motion for leave to supplement the record to include the expert testimony of plaintiff's experts Kevin Murphy, Dileep Sirur

and Joseph Leto.  The motion will be granted.  Although defendant wants to include Dileep Sirur's expert testimony, it has also filed a motion to strike portions of the same expert report.  Peculiar as this may seem, defendant explains that the second motion  is conditional upon the court's denial of plaintiff's motion to strike Jeffrey Bernard's expert; if the motion is denied, its motion to strike is moot.  Because I have granted plaintiff's motion to strike Bernard's supplemental report, I must consider defendant's motion to strike excerpts of Sirur's expert report.

Defendant contends that Sirur's opinions regarding (1) the 75% allocations imposed by plaintiff at the Rockford/Marathon exchange terminal after August 29, 2005 (¶¶13-20); (2) the effect of Hurricanes Katrina and Rita at terminals other than the Rockford/Marathon terminal (¶¶21-22); and (3) "ratability" (¶¶26-30) are improper rebuttal because Bernard said nothing about these matters in his initial expert report.  I agree with defendant as to the first two matters addressed by Sirur's expert report but not as to the last.  In his expert report, Bernard addresses primarily the effect of fuel supply shortage before August 29, 2005. Therefore, paragraphs 13-22 of Sirur's report addressing fuel shortages after August 29 are improper rebuttal and will be stricken.  However, Bernard did address plaintiff's possible defense of "ratability" and discounted it as a credible defense.  Bernard Expt. Rpt., dkt. #117, at 15.  Sirur's opinion regarding "ratability" is proper rebuttal.

10

C. <u>Motion for Leave to Amend to Assert an Additional Affirmative Defense</u>

I will deny defendant's last minute (June 29, 2009) motion for leave to allege an additional affirmative defense of "constructive termination" of the parties' franchise agreement in violation of the Petroleum Marketing Practices Act, 15 U.S.C. § 2801, without allowing additional briefing.  Defendant acknowledges that this court has consistently denied defendant's repeated efforts to assert counterclaims for alleged violations of the Petroleum Marketing Practices Act as barred by the statute of limitations applicable to the Act.  This time, defendant argues that the Act does not bar a "constructive termination" claim as an affirmative defense.  In support of this theory, defendant cites <u>Beach v. Ocwen Federal Bank</u>, 523 U.S. 410 (1998), in which the Supreme Court held that "[s]o long as the plaintiff's action is timely, . . . a defendant may raise a claim in recoupment even if he could no longer bring it independently, absent the clearest congressional language to the contrary."  <u>Id</u>. at 415 (citation omitted).  <u>Beach</u> does not save defendant's claim.  As the Court explained, a claim for recoupment is a "defense arising out of some feature of the transaction upon which the plaintiff's action is grounded."  <u>Id</u>.; <u>Reiter v. Cooper</u>, 507 U.S. 258, 264 (1993).  Defendant's affirmative defense is not a claim for recoupment under the Act for the simple reason that plaintiff's action is not grounded upon the Petroleum Marketing Practices Act, but upon state contract law.  Defendant's affirmative defense of constructive termination cannot be said to arise out of some feature of a state contract claim.

11

I will not allow defendant's new effort to slip a claim under the Act into this case in the form of an affirmative defense when plaintiff has not asserted claims based on the Act. Like defendant's counterclaim, plaintiff's claims are breach of contract claims. It is unnecessary to consider the Act in resolving them. Defendant's motion for leave to amend will be denied.

## II. SUMMARY JUDGMENT MOTION

Before proceeding to the merits of the parties' claims, I must discuss procedure. After this case was reassigned, the parties were given instructions for filing summary judgment submissions. Procedure to be Followed on Motions for Summary Judgment & Helpful Tips to Filing a Summary Judgment Motion in Cases Assigned to Judge Barbara B. Crabb, attached to Preliminary Pretrial Conference Order, dkt. #29. As these documents explain, a party opposing summary judgment must file a brief with opposing legal arguments, a response to the movant's proposed findings of fact, and evidentiary materials to support the factual propositions. Each fact must be proposed in a separate paragraph and supported by a reference to supporting evidence.

In opposing plaintiff's motion, defendant failed to comply with these procedural rules. Defendant states in its proposed findings of fact that it is has "present[ed] substantial evidence that prior to August 29, 2005, when Hurricane Katrina struck the Gulf Coast,

[plaintiff] was already an unreliable supplier of fuel to [defendant], such that [defendant] was chronically experiencing fuel outages that were completely unacceptable to [defendant]." Dft.'s PFOF, dkt. #118-3, at 2-3. However, defendant fails to propose any specific facts regarding the undersupply as instructed by this court's summary judgment order. Rather, defendant provides a general cite to the expert report of Jeffrey Bernard, the affidavit of its own counsel and the deposition of Frank Louis, defendant's vice-president of supply .

Plaintiff cannot be expected to respond to the facts proposed by defendant when defendant gives only a general cite to a report, does not identify the specific facts it is asserting and does not say where the court and plaintiff can find the support for those asserted facts. Harney v. Speedway SuperAmerica, LLC, 526 F.3d 1099, 1104 (7th Cir. 2008) ("It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies.") Neither plaintiff nor the court should be required to do defendant's work for it. Accordingly, I will disregard defendant's proposed facts regarding plaintiff undersupply in 2005. Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003) ("A party's failure to comply with summary judgment evidentiary requirements is traditionally remedied . . . by excluding the non-conforming submission . . . and then determining whether [the remaining facts] entitle the moving party to judgment as a matter of law").

13

Although this case has been pending for almost 18 months, defendant's response to many of plaintiff's proposed findings of fact includes a request for additional discovery under Rule 56(f), which provides that a court may deny a summary judgment motion if the nonmoving party has not had a fair opportunity to engage in full discovery of a disputed issue. "Rule 56(f) requires a party to state the reasons why it cannot adequately respond to the summary judgment motion without further discovery and must support those reasons by affidavit." Waterloo Furniture Components, Ltd. v. Haworth, Inc., 467 F.3d 641, 648 (7th Cir. 2006). Defendant never filed a motion under Rule 56(f) or attempted to show why it would be unable to respond adequately to plaintiff's proposed facts. Defendant has suggested no reason for its failure to secure necessary discovery in time to oppose the motion. Accordingly, its implicit Rule 56(f) motion will be denied. I will accept as undisputed those facts for which defendant's only objection is Rule 56(f). Kalis v. Colgate-Palmolive Co., 231 F.3d 1049, 1057 n.5 (7th Cir. 2000) ("'When a party fails to secure discoverable evidence due to his own lack of diligence,' the necessary justification [for Rule 56(f)] is lacking, and 'it is not an abuse of discretion for the trial court to refuse to grant a continuance to obtain such information.'") (quoting Pfeil v. Rodgers, 757 F.2d 850, 856 (7th Cir. 1985)).

From the parties' proposed findings of fact, I find the following facts to be material and undisputed.

14

UNDISPUTED FACTS

A. Parties

Plaintiff CITGO Petroleum Corporation is a Delaware corporation with its principal place of business in Houston, Texas. It refines and markets CITGO-brand gasoline and other petroleum products through a network of independent franchised distributors that in turn resell to independent retailers or directly to the public through retail outlets.

Defendant Ranger Enterprises, Inc. is an Illinois corporation with its principal place of business in Rockford, Illinois. From 1991 until 2006, defendant was a franchisee for plaintiff and sold CITGO-brand gasoline at retail locations in Illinois, Indiana and Wisconsin. Defendant purchased gasoline from plaintiff for resale to the motoring public at service stations displaying the CITGO brand name and trademarks.

B. The Distributor Franchise Agreement

On October 7, 1991, the parties entered into a franchise relationship by signing a distributor franchise agreement. Paragraph 2 of the franchise agreement is entitled "Quantities" and states in relevant part:

> Franchisee shall purchase and accept hereunder quantities of products as set forth below during the respective monthly periods and CITGO shall sell and deliver the specified quantities of products during the respective monthly periods. Franchisee hereby acknowledges and agrees that the purchase and ratable lifting of the monthly quantities of product specified herein by

15

> Franchisee are reasonable, important and of material significance to the franchise relationship. Franchisee understands and agrees that any failure by Franchisee to purchase and accept a minimum of ninety (90%) of the monthly quantity of gasoline or diesel fuel listed below during any month on a ratable basis shall be a violation of this Agreement.

Dkt. #1, Exh. A, at ¶ 2.

Between 1991 to 2005, the parties amended the franchise agreement from time to time to increase the annual volume of gasoline that plaintiff would sell and defendant would buy. In December 2005, the parties amended the agreement to reduce the fuel quantities defendant was required to purchase.

On June 30, 2005, Mike Slider, defendant's vice president of fuel supply and distribution, emailed plaintiff's representative, Brad Winczewski, informing him that defendant was having difficulty purchasing gas at four terminals in Illinois, Indiana and Wisconsin. Shortly after June 30, 2005, defendant's president, Dan Arnold, told Winczewski that defendant would "sign a mutual cancellation."

C. Fuel Supply Shortages During Hurricanes Katrina and Rita

In 2005, plaintiff operated two of its largest refineries on the Gulf Coast of the United States in Corpus Christi, Texas, and Lake Charles, Louisiana. The Lake Charles refinery was a primary and substantial source of the gasoline and other petroleum products plaintiff sent to its distributors in the midwestern United States, including defendant. On August 29,

16

2005, Hurricane Katrina struck the Gulf Coast.  Hurricane Rita hit the same area one month

later.  The two hurricanes caused substantial shortages of products and refining capacity to

plaintiff and to the petroleum industry.

On two separate occasions in the fall of 2005, plaintiff told defendant and its other

customers in defendant's supply region that it would "allocate" its gasoline products.  The

distributor franchise agreement provides that if

> because of a shortage of crude oil, raw materials, products, or refining capacity,
> either of its own, or of its other regular sources of supply, or in the industry
> generally, or because of governmental regulations, or for any reason, [plaintiff]
> deems that it may be unable to meet all of its supply requirements, [plaintiff]
> may allocate its products equitably among its various customers pursuant to a
> plan, method or formula as [plaintiff] believes fair and reasonable.  Franchisee
> agrees to be bound by any such allocation.  During the period of such
> allocation, the provisions of Paragraph 2 relating to volume requirements shall
> not be effective, and the quantity deliverable under this Agreement shall then
> be such quantity as [plaintiff] determines it can equitably allocate to
> Franchisee.  Upon cessation of any such period of allocation neither [plaintiff]
> nor Buyer shall be obligated to make up any quantities omitted pursuant to the
> provisions herein.

Flagg Dec., dkt. #99, Exh. A, ¶8.

Between August 29, 2005 and September 8, 2005 and between September 21, 2005

and October 13, 2005, plaintiff allocated its gas products.  After Hurricane Katrina, in

September 2005, defendant experienced fuel shortages that defendant's president, Dan

Arnold, believed might put defendant out of business.

17

D. <u>The 2005 Amendment of the Franchise Agreement</u>

The original distributor franchise agreement between the parties went into effect on November 1, 1991.  The contract stated that the "Agreement shall be effective for a term of five (5) years, beginning 11/01/91 and expiring on 10/31/96."  In 1992, the parties amended the distributor franchise agreement.  Under the amendment, the agreement would be in effect from August 1, 1993 to July 31, 1997 and would renew automatically for a period of three years unless terminated or non renewed as provided for in the Petroleum Marketing Practices Act.  Under the original agreement, the franchise agreement (after several automatic renewals) would have terminated on October 31, 2005; the effect of the 1992 amendment was to make the dispositive expiration date July 31, 2006.

In November 2005, defendant concluded that plaintiff's uncured fuel supply obligations were cause for defendant to terminate the relationship.  Defendant told plaintiff it was pulling out and began the process of planning to de-brand.  On November 16, 2005, Arnold emailed Winczewski, plaintiff's representative, stating

> On June [30] 2005 I sent an e-mail to you stating that I will not be renewing the Supply Contract that has now expired as of October, 30 2005. Nothing has happened during the 120[-day] notice given.  We have had numerous discussions about "setting down with Gene" but no appointment has been arranged.  It is now two weeks since our Supply Contract has expired[.]

Joseph Dec., dkt. #98-4, Exh. J at 60.  Up to this time, Arnold was under the mistaken belief that the expiration date of the franchise agreement was October 31, 2005 (and not July 31,

18

2006).  On November 30, 2005, he emailed plaintiff, stating that "I am concluding that I need to be making other plans."

Arnold met with Winczewski and Gene Kiesling during the first week of December 2005.  On December 20, 2005, defendant sent plaintiff an executed amendment to the distributor franchise agreement, reducing the required monthly purchase volume from 6,000,000 to 5,175,000 gallons, effective December 1, 2005.   Every amendment to the franchise agreement executed by the parties, including the 1992 Amendment, 2004 Amendment and the 2005 Amendment, contained the following provision: "ALL OTHER TERMS AND CONDITIONS OF THE AGREEMENT SHALL REMAIN IN FULL FORCE AND EFFECT."

During December 2005, defendant purchased 106.99% of its contract volume of gasoline from plaintiff.

### E.  Defendant De-brands

As defendant's senior director of supply in 2006, Frank Louis's objective was to find new suppliers to replace all of plaintiff's supply.  Accordingly, he bought from plaintiff only when he found the price attractive.  Defendant continued to accept deliveries from plaintiff through July 31, 2006.   In 2006, defendant made the following monthly purchases:

19

| Month | Purchases (in gallons) | Contract Volume | Purchases (as % of contract volume) |
|---|---|---|---|
| January | 3,168,962 | 5,175,000 | 61.23% |
| February | 1,781,916 | 5,175,000 | 34.43% |
| March | 2,124,680 | 5,175,000 | 41.05% |
| April | 2,555,913 | 5,175,000 | 49.38% |
| May | 1,193,241 | 5,175,000 | 23.05% |
| June | 1,060,274 | 5,175,000 | 20.48% |
| July | 1,208,348 | 5,175,000 | 23.34% |
|  |  |  |  |
| TOTAL | 13,093,334 | 36,225,000 | 36.14% |

To meet its contractual minimum for January through July 2006, defendant was required to purchase 90% of contract volume of 36,225,000.  By purchasing 13,093,334 gallons, defendant was 19,509,166 gallons short of its minimum for the year.

On January 17, 2006, plaintiff sent defendant a new form entitled "Marketer Franchise Agreement," which was intended to replace the franchise agreement when it expired on July 31, 2006.  On February 8, 2006, defendant acknowledged that it had received the new agreement and stated:  "This letter is not a rejection of the [new agreement] or notice that [defendant] does not intend to renew its Franchise Agreement, but only to inform [plaintiff] that we will not be able to respond prior to its February 15, 2006 deadline."  By

20

April 28, 2006, defendant had not responded to the request to execute the new agreement. On that date, plaintiff wrote defendant, stating that "This letter will serve as formal notice to you that your franchise relationship with [plaintiff] will not be renewed as of the close of business on July 31, 2006. In compliance with the Petroleum Marketing Practices Act, enclosed you will find the Secretary of Energy's Summary Statement outlining your rights under the Act."

On or about June 1, 2006, defendant began the process of de-branding. Defendant de-branded all the locations by no later than July 31, 2006. Re-branding cost defendant $1,439,803.62.

### F. Branding Agreements and De-Branding Calculations for Defendant's Locations

#### 1. The branding agreements

In addition to the franchise agreement, plaintiff and defendant entered into at least 39 separate agreements known as competitive allowance agreements and brand allowance program agreements, which I will refer to collectively as the branding agreements. Each of these branding agreements pertains to a particular retail location operated by defendant. In general, the agreements require defendant to keep a station branded for 7 to 10 years. In exchange, plaintiff pays the initial cost of branding the station and gives defendant "allowance payments" in the form of a quarterly cents-per-gallon rebate on gasoline purchased. The

branding agreements contain provisions explaining the parties' rights in the event that a

location is de-branded.  The agreements state in relevant part:

> If the location debrands, for any reason, before the completion of the
> commitment period . . .  the Marketer shall reimburse CITGO all or a portion
> of the Allowance payments received for the Location, which reimbursement
> shall be based upon the number of years the Location was branded CITGO
> after the Effective Date.

> * * *

> If the location debrands, the Marketer shall reimburse to CITGO all or a
> portion of CITGO's costs incurred in branding the Location including the cost
> for branding materials supplied for the Location by CITGO.   This
> reimbursement shall be CITGO's cost after depreciation.  Depreciation shall be
> based upon the straight line method over 60 months from the Effective Date.
> Used signs or other branding materials cannot be returned for credit.

> * * *

> Marketer cannot assign or transfer his rights under this agreement without
> prior written consent of CITGO.

Flagg Dec., dkt. #99-2, Exh. B., at 4-5, ¶¶4 and 7, 11 (competitive allowance agreement); see

also id. at 2, ¶¶7-8, 12 (brand allowance agreement).  The branding agreements further

provide:  "Marketer will not be entitled to receive the Allowance for any quarter in which the

Marketer fails to lift 90% of his total [franchise agreement] volume[.]"   Id. at 2, ¶6; at 4, ¶5.

The branding agreements set forth a location-specific reimbursement schedule.  Before the

end of the franchise relationship, the total amount that plaintiff advanced to defendant under

the 39 branding agreements was $3,878,177.40.

2.  Stores sold before June 1, 2006

Before June 1, 2006, defendant sold the stores at the following locations:   Store #10833127 at 2302 Market Street in Bloomington, Ilinois;   Store #10833128 at 1685 South Baltimore Avenue in Decatur, IL; and Store #10833135 at 2760 North Oakland Avenue in Decatur, IL.   All three stores were covered by the brand allowance program and defendant had agreed to run them under the CITGO brand for 10 years.   The reimbursement schedule for these stores is as follows:

       1. Bloomington Store:        $111,506.46 (Nov. 30, 2006);

                                    $139,259.19 (July 31, 2006)

       2. South Baltimore, Decatur, IL:  $57,844.05 (Nov. 30, 2006);

                                      $83,076.35 (July 31, 2006)

       3. North Oakland, Decatur, IL:    $107,071.80 (Nov. 30, 2006):

                                      $107,094.97 (July 31, 2006)

(Defendant denies that these stores should be included in plaintiff's de-branding calculations because defendant did not own them as of June 1, 2006.)


3.  Locations de-branded by July 31, 2006

On December 22, 2006, plaintiff notified defendant in writing that the early de-branding of all 39 stations triggered defendant's reimbursement obligations under the

23

agreements in the amount of $2,780,177.40.  This amount was calculated using a de-branding date of November 30, 2006.  Because the reimbursement amounts decrease with the passage of time, this amount was lower than a reimbursement amount computed using the earlier, actual de-branding date of July 31, 2006.  Store # 10833137 in Jerome, Illinois was de-branded before June 1, 2006, after it was hit by a tornado.  If an April 15, 2006, date is used for location #10833137, and a July 31, 2006, date is used for all the other locations, the amount owed under the branding agreements is $3,071,147.08.

The following chart lists all the stores de-branded by July 31, 2006 except the stores sold before June 1, 2006 and store #10833137, which was  hit by the tornado.  The chart includes the following information: (1) the store number and location of the CITGO-brand gasoline stations owned, operated or licensed by defendant; (2) how many years defendant was committed to operate under the CITGO-brand; and (3) and the reimbursement amount owed under the respective branding agreements.

| Store # | Location | Branding Agreement Years in Effect | Reimbursement (Nov. 30, 2006) | Reimbursement (July 31, 2006) |
|---|---|---|---|---|
| 10833009 | Cherry Valley, IL 61108 | 10 years | $140,295.91 | $140,835.63 |
| 10833010 | Madison, WI 53704 | 7 years | $39,402.76 | $39,551.90 |
| 10833011 | Rockford, IL 61108 | 10 years | $195,733.85 | $264,231.29 |

24

| Store # | Location | Branding Agreement Years in Effect | Reimbursement (Nov. 30, 2006) | Reimbursement (July 31, 2006) |
|---|---|---|---|---|
| 10833012 | Rockford, IL 61108 | 7years | $41,384.49 | $42,085.44 |
| 10833013 | Rockford, IL 61102 | 7 years | $32,836.52 | $33,217.07 |
| 10833015 | Rockford, IL 61114 | 7 years | $39,488.27 | $39,876.99 |
| 10833016 | Oakdale, WI 54649 | 7 years | $1,978.97 | $2,713.44 |
| 10833017 | Springfield, IL 62703 | 7 years | $4,573.46 | $5,300.84 |
| 10833018 | Rochelle, IL 62703 | 7 years | $1,691.91 | $2,205.90 |
| 10833020 | Springfield, IL 62707 | 7 years | $14,813.68 | $28,460.91 |
| 10833021 | Loves Park, IL 61111 | 7 years | $22,241.09 | $22,905.63 |
| 10833106 | Rockford, IL 61108 | 7 years | $34,080.70 | $35,170.08 |
| 10833131 | Springfield, IL 62703 | 7 years | $29,618.37 | $29,929.97 |
| 10833134 | Decatur, IL | 10 years | $111,097.58 | $111,400.96 |
| 10833136 | Cottage Grove, WI 53527 | 10 years | $139,708.01 | $140,621.70 |
| 10833139 | Tuscola, IL 61953 | 10 years | $114,558.03 | $115,330.92 |

25

| Store # | Location | Branding Agreement Years in Effect | Reimbursement (Nov. 30, 2006) | Reimbursement (July 31, 2006) |
|---------|----------|-----------------------------------|-------------------------------|-------------------------------|
| 10833140 | Mendota, IL 61342 | 10 years | $115,668.06 | $119,610.36 |
| 10833141 | Brazil, IN 47834 | 10 years | $78,172.42 | $78,962.10 |
| 10833205 | South Beloit, IL 61080 | 10 years | $127,302.24 | $158,244.94 |
| 10833206 | Winnebago, IL 60188 | 7 years | $40,513.05 | $41,131.26 |
| 10833207 | Belvidere, IL 51108 | 7 years | $59,492.57 | $59,931.07 |
| 10833211 | Loves Park, IL 61111 | 10 years | $98,391.00 | $100,187.77 |
| 10833224 | Freeport, IL 61032 | 10 years | $117,012.89 | $117,063.34 |
| 10833225 | Princeton, IL 61356 | 10 years | $115,290.55 | $116,296.47 |
| 10833226 | Greenwood, IN 46143 | 10 years | $105,457.99 | $106,438.09 |
| 10833228 | DeKalb, IL 60115 | 10 years | $69,870.10 | $70,733.69 |
| 10833231 | McChesney Park, IL 61115 | 10 years | $20,479.06 | $27,129.92 |
| 10833235 | Hampshire, IL 60140 | 7 years | $28,422.19 | $28,700.11 |
| 10833239 | Lake Station, IN 46405 | 7 years | $34,675.61 | $35,918.17 |

26

| Store # | Location | Branding Agreement Years in Effect | Reimbursement (Nov. 30, 2006) | Reimbursement (July 31, 2006) |
|---------|----------|-----------------------------------|-------------------------------|-------------------------------|
| 10833240 | Lake Station, IN 46405 | 10 years | $83,383.06 | $84,048.56 |
| 10833318 | Rockford, IL 61103 | 7 years | $15,519.14 | $15,566.58 |
| 10833321 | DeKalb, IL 60115 | 7 years | $39,269.68 | $39,453.69 |
| 10833322 | Rockford, IL 61109 | 10 years | $111,952.17 | $157,929.74 |
| 10833323 | Champaign, IL 61822 | 10 years | $77,489.87 | $75,344.98 |
| 10833324 | Roscoe, IL 61703 | 10 years | $91,198.08 | $91,286.63 |

## G. Defendant's Damages Claim

During his deposition, defendant's Chief Financial Officer David Saporta testified that "there was lost value to the company . . . [in] the tens of millions of dollars" which comes from looking at the lost profitability of the stations that were branded CITGO through those time periods discussed and placing a value on the lost profitability from a company valuation standpoint." In interrogatory responses, defendant asserted that it was entitled to the following categories of damage: (1) "out-of-pocket costs of de-branding and re-branding ($1,439,803.62 as of 2006)"; (2) "lost opportunity costs from not being able to put the costs

27

of de-branding and re-branding to a more profitable use"; (3) "lost value in the company which arose from the fact that the company had to launch a new and independent brand (Road Ranger), as opposed to benefitting from an established brand (CITGO)"; (4) "The damages presently estimated by Ranger CFO Dave Saporta" in a spreadsheet attached to the interrogatory answers; and (5) "Cover damages arising from and related to the necessity of Ranger having to purchase fuel from non-CITGO parties due to CITGO's inability to supply the fuel it contracted to supply."  Saporta Dep., dkt. #103, at 134-35.

OPINION

A.  Applicable Law

The parties assume that Oklahoma law governs their breach of contract dispute.  In addition, the parties' franchise agreement includes a provision stating that "[t]his Agreement shall be governed by the laws of the State of Oklahoma."  Dkt. #98-2, Exh. A, at 16. Accordingly, I will apply Oklahoma law to the agreement.

B.  Plaintiff's Breach of Contract Claims

1.  Defendant's failure to purchase gas in 2006

To recover on its breach of contract theory, plaintiffs must prove:  "1) formation of a contract; 2) breach of the contract; and 3) damages as a direct result of the breach."  Digital

28

Design Group, Inc. v. Information Builders, Inc., 24 P.3d 834, 843 (Okla. 2001).  It is
undisputed that a valid and enforceable contract (the distributor franchise agreement) existed
between the parties and that in December 2005, they amended the franchise agreement to
reduce the amount of fuel defendant was required to purchase each month from 6,000,000
to 5,175,000 gallons.  Between January and July of 2006, defendant failed repeatedly to
purchase the required amount.  As of July 31, 206, defendant was 19 million gallons short
of its contractual minimum and in breach of the franchise agreement.

As obvious as this conclusion seems, defendant argues that it is not liable for breach
of either the franchise agreement or the branding agreements because plaintiff allegedly
committed a prior material breach of agreement by failing to supply fuel in 2005 and because
plaintiff has failed to show that it suffered any damage as a result of the diminished fuel
purchases in December 2005 and the first seven months of 2006.  (Defendant contends for
the first time that plaintiff's supply problems continued into 2006.  Defendant did not
include any allegations to that effect in its third amended counterclaim and never moved to
amend the counterclaim to include such a claim.   Accordingly, I will disregard the
contention.)

Neither party has moved for summary judgment on the matter of damages owed
plaintiff by defendant for failure to comply with the fuel purchase requirement set out in the
amended franchise agreement.  It will be up to the jury to determine the amount of damages,

with plaintiff bearing the burden of proving actual damages sustained as a consequence of defendant's breach.

As to the alleged prior material breach, "[g]enerally, where one party contends that it is relieved of performing its own contractual obligation by the breach of the other party, the controlling issue is whether the breach invoked as a basis for relief is material." Polymer Fabricating, Inc. v. Employers Workers' Compensation Association, 980 P.2d 109, 115 (Okla. 1998). A breach is material when it "defeats the object of the contract or [] concerns a matter of such importance that the contract would not have been made if default in that particular had been expected." Id. Defendant contends that plaintiff's failure to supply fuel during 2005 constituted a material breach because it undermined plaintiff's reliability as a fuel supplier.

It is undisputed that in June of 2005 Mike Slider, defendant's vice president of fuel supply and distribution, emailed Winczewski, plaintiff's representative, informing him that defendant was having difficulty purchasing gas from four terminals and that plaintiff allocated gasoline to defendant during September and October 2005 when Hurricanes Rita and Katrina struck. This is the only evidence defendant has adduced of plaintiff's alleged undersupply.

From these sparse facts, no reasonable jury could conclude that plaintiff materially breached the parities' franchise agreement, especially with regard to the allocation period following the hurricanes. First, plaintiff failed to deliver gas on only a limited number of

30

occasions over the course of a fifteen-year franchise relationship.  Second, the franchise agreement expressly authorizes plaintiff to allocate its products if, "because of a shortage of crude oil, raw materials, products, or refining capacity, either of its own, or of its other regular sources of supply, or in the industry generally, or because of governmental regulations, or for any reason, [plaintiff] deems that it may be unable to meet all of its supply requirements." It is undisputed that Hurricanes Katrina and Rita caused substantial shortages of products and refining capacity to both plaintiff and the petroleum industry.  Thus, plaintiff was authorized under the franchise agreement to allocate fuel during these periods.  The facts do not support a finding that any of plaintiff's alleged breaches or its allocation defeated the purpose of the contract.

The parties' agreement is an installment contract for the sale of goods.  Under Oklahoma law, contracts for the sale of goods are governed by the Uniform Commercial Code.  Goodwin v. Durant Bank & Trust Co., 952 P.2d 41, 43, n.6 (Okla. 1998); Perry v. Lawson Ford Tractor Co., 613 P.2d 458, 462 (Okl. 1980).  Under § 2-612 of the UCC, a breach occurs "whenever non-conformity or default with respect to one or more installments substantially impairs the value of the whole contract."  However, "the aggrieved party reinstates the contract if he accepts a non-conforming installment without seasonably notifying of cancellation or if he brings an action with respect only to past installments or demands performance as to future installments."  U.C.C. § 2-612(3).  It is undisputed that

31

in December of 2005 defendant purchased more than 100% of the required minimum gasoline and that in that same month it signed an amendment to the franchise agreement. By signing the new amendment, defendant demanded performance as to future installments and reinstated the contract. After this, it was not entitled to use the past breaches as a basis for its non-performance unless plaintiff failed to provide adequate fuel supply after the 2005 amendment.

Defendant makes much ado about plaintiff's statement that "for the purposes of summary judgment under supply is assumed," Plt.'s Sur-reply Br., Dkt. #110, at 1, calling the statement duplicitous and sanctionable. Plaintiff's statement is nothing more than a claim that plaintiff is entitled to judgment on its claims, regardless of the undersupply. It does not establish any fact about undersupply, either whether it occurred or to what extent.

In its attempt to prove that the undersupply amounted to a material breach, defendant relies for proof almost entirely on the report by its expert Jeffrey Bernard. Although Bernard concludes that the undersupply threatened the existence of defendant's business and justified its de-branding, his report is too conclusory and lacking in factual support to constitute the proof that defendant needs. Mid-State Fertilizer v. Exchange National Bank, 877 F.2d 1333, 1338-39 (7th Cir. 1989) (expert affidavits cannot contain mere conclusory statements but must reveal "a process of reasoning beginning with a firm foundation"). Defendant has submitted no evidence of how much gasoline plaintiff failed to deliver, how many stations

32

were affected, how the undersupply affected these stations or any other evidence that would demonstrate that the undersupply was as detrimental as Bernard says it was.

I conclude that defendant's evidence is insufficient to allow a reasonable jury to find that plaintiff committed a prior material breach. Accordingly, plaintiff is entitled to summary judgment on its claim that defendant breached the parties' franchise agreement by failing to purchase the required minimum fuel and on defendant's affirmative defense of prior material breach.

2. Defendant's de-branding before July 31, 2006

Plaintiff's second breach of contract claim relates to the branding agreements governing individual gasoline and retail locations in Wisconsin, Illinois and Indiana. According to plaintiff, the branding agreements are all separate and distinct contracts that provide their own rights and duties between the parties. The 39 branding agreements require defendant to reimburse a predetermined amount of branding costs and rebates received if the station de-brands "for any reason." When defendant de-branded the 39 locations at issue in this case before July 31, 2006, it violated this portion of the branding agreements and therefore must reimburse plaintiff for the money it spent in branding defendant's locations. These reimbursements are calculated by a schedule that reduces the amount defendant would owe on the basis of the number of years it has been branded.

33

Defendant objects to plaintiff's view of the evidence on a number of grounds.  First, it contends that it is not liable to plaintiff for stores ##10833127, 10833128 and 10833135 located in Bloomington and Decatur, Illinois because it sold these stores before June 1, 2006.  Second, it contends that plaintiff seeks damages for stores whose amortization periods expired before defendant de-branded.  Third, it argues that, even if it breached the branding agreements, it is not liable because plaintiff committed a prior material breach of the distributor franchise agreement, frustrated the purpose of the branding agreements and made it impossible to perform the branding agreements.

Under Oklahoma law, "[i]f the contract language is free of ambiguity, its meaning is a matter of law for the court."  M.J. Lee Construction Co. v. Oklahoma Transp. Authority, 125 P.3d 1205, 1210 (Okla. 2005);  Corbett v. Combined Communications Corp. of Oklahoma, Inc., 654 P.2d 616, 617 (Okla. 1982) ("If the language of a contract is clear and without ambiguity, the court is to interpret it as a matter of law.  Similarly, existence of an ambiguity is a decision to be made by the Court.") (Internal citation omitted.).  "A contract is ambiguous if it is reasonably susceptible to at least two different interpretations."  M.J. Lee Construction, 125 P.3d at 1213.  If no ambiguity exists, intent is to be determined from the words used "unless there is fraud, accident, or pure absurdity."  Public Service Co. of Oklahoma v. Burlington Northern Railroad Co., 53 F.3d 1090, 1097 (10th Cir. 1995) (analyzing contract interpretation under Oklahoma law).  "The law will not make a better

34

contract than the parties themselves have seen fit to enter into, or alter it for the benefit of one party to the detriment of another." <u>King-Stevenson Gas & Oil Co. v. Texam Oil Corp.</u>, 466 P.2d 950, 954 (Okla. 1970). In this case, the parties agree that the terms of the branding agreement are not ambiguous. Accordingly, the language of the branding agreements governs plaintiff's de-branding claims.

a. Stores ##10833127, 10833128 and 10833135

With respect to the three stations that were sold before June 1, 2006, defendant denies any liability for de-branding these stations because it no longer controls them. However, the branding agreements state explicitly that the franchisee cannot assign or transfer his rights under the programs without prior written consent by plaintiff. Dkt. #98-2, Exh. B, at 2, ¶12 (terms and conditions for brand allowance programs), at 4, ¶11. Defendant has offered no evidence of prior written consent. It admits that these stations were de-branded before July 31, 2006. Therefore, it cannot escape liability for the de-branding costs of these stores.

b. Stores where branding agreement expired

In its opposition brief, defendant contends that stores ## 10833017, 10833018 and 10833021 had already fulfilled their obligations under the branding agreement and therefore, defendant should not be liable for de-branding these stores. It cites no facts to support the

contention that the agreements had expired before defendant de-branded, but refers only to facts proposed by plaintiff that show the date the branding agreement was signed and the length of the contract.  These proposed facts do not support a finding that any of the agreements had expired.  If defendant had intended to dispute whether it was liable for de-branding these locations, it should have disputed this fact and proposed its own facts showing the existence of a material dispute.  Without such evidence, no reasonable jury could find that the branding agreements for store ## 10833017, 10833018 and 10833021 had expired before July 31, 2006.

c. Liability regardless of fault

The branding agreements provide that if any location de-brands, "for any reason," defendant must reimburse plaintiff for allowance payments and all or a portion of the branding costs.  As discussed above, under Oklahoma law, when a contract contains no ambiguity regarding its terms, its interpretation is a question of law.  The contract language contains no apparent ambiguity:  it states clearly that defendant is liable if it de-brands prematurely.

Defendant argues that "for any reason" should not be read as a no fault provision, saying that reading it this way would be absurd and commercially unreasonable.  It contends that the   the branding agreements should be read in conjunction with the distributor

36

franchise agreement.   Contrary to defendant's position, there is nothing absurd or commercially unreasonable in requiring a party to pay back unearned incentives or the cost of branding materials advanced by the other party.  The reimbursement and amortization schedule is a straightforward way for plaintiff to protect itself when it advances money and materials to a new franchisee, who might otherwise choose to de-brand any time a better deal came along.   Whether defendant's president understood that the main agreement was the franchise agreement and not the branding agreements has no bearing on the dispute.  "Under Oklahoma law, '[w]here a party signs a written agreement, in the absence of false representation or fraud, he is bound by it, although ignorant of its contents.'"  Elsken v. Network Multi-Family Sec. Corp., 49 F.3d 1470, 1474 (10th Cir. 1995) (citing Hicks v. State Farm Mutual Auto Insurance Co., 568 P.2d 629, 633 (Okla. 1977)).  Arnold signed each branding agreement as well as the franchise agreement in his capacity as defendant's president of operations.  "The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter, which preceded or accompanied the execution of the instrument."  Okla. St. Ann. tit. 15, § 137.

With respect to the claim that the franchise agreement and not the branding agreements govern the de-branding dispute, defendant cites no language in the branding agreements suggesting that they are meant to be interpreted in conjunction with the

37

franchise agreement.  Although the branding agreements provide for revocation of these agreements if the parties no longer have a franchise agreement in effect or if a franchisee violates the franchise agreement, they do not provide that the branding agreements are of no effect if the franchisor breaches the franchise agreement. Dkt. #99-2, Exh. B., at 5, ¶¶ 12-13.

However inequitable this arrangement may seem to defendant, it is plaintiff and not defendant that bears the greatest risk under the branding agreements.  It is plaintiff that makes allowance payments and pays the cost of branding the gas stations; all defendant is required to do is wave and maintain the brand flag.  A contract provision that provides protection for the party taking the entire risk is not inequitable.

I conclude that the branding agreements are separate contracts that govern the parties de-branding dispute.  Any breach of the franchise agreement is irrelevant to defendant's liability for de-branding under the branding agreements.

d. Affirmative defenses: prior material breach, frustration of purpose and impossibility

According to defendant, it is more sinned against than sinning because plaintiff was in material breach first and because that breach frustrated the purpose of the branding agreements and made their performance impossible.  As I explained above, defendant has failed to show that plaintiff's alleged breach was "material."  Therefore, I will grant plaintiff's request for summary judgment on this affirmative defense.  Both  of the remaining defenses

fail as a matter of law.

Impossibility of performance is a defense to non-performance when "before the time for performance and without the default of either party the particular thing ceases to exist and be available for the purpose." Kansas, Oklahoma and Gulf Ry. v. Grand Lake Grain Co., 434 P.2d 153 (Okla.1967). However, "the duty of a promisor is not discharged by the mere fact that supervening events deprived him of the ability to perform, if they are not such as to deprive other persons similarly situated of the ability to so perform." Oklahoma Gas and Elec. Co. v. Pinkerton's Inc., 742 P.2d 546 (Okla. 1986). In this case, nothing prevented defendant from fulfilling its obligations under the branding agreements before July 31, 2006. Even if there were some instances of undersupply in 2005, defendant has submitted no evidence that in the months before July 31, 2006 it could no longer purchase gas from plaintiff and maintain its branding. It was defendant's choice to de-brand before the termination of the parties' franchise agreement. No other force intervened.

The essential elements of a frustration of purpose defense are "1) frustration of the principal purpose of the contract; 2) that the frustration is substantial; and 3) that the non-occurrence of the frustrating event or occurrence was a basic assumption on which the contract was made." Sabine Corp. v. ONG Western, Inc., 725 F. Supp. 1157, 1178 (W.D. Okla. 1989) (quoting Restatement (Second) of Contracts § 265). It is clear from the branding agreement that the purpose of the agreement was to insure that defendant did not

39

de-brand before the termination of the agreements, which required defendant to brand the location with plaintiff's materials within six months of the signing of the agreement and to not de-brand in anticipation.  Defendant does not argue that it could not meet these requirements.

Defendant seems to believe that plaintiff's alleged breach of the franchise agreement frustrated the purpose of the branding agreements, but again, no breach of the franchise agreement has any bearing on the dispute over the branding agreement.  13 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts, § 39:2, at 512-23 (4th ed. 2002) ("A party to a contract is not excused for nonperformance due to the fact that the other party to the contract has breached a separate contract between them, nor due to the fact that nonperformance under a prior contract or contracts between the parties has been excused.").  Even if those breaches of the franchise agreement bore on the enforceability of the branding agreements, defendant cannot show that those breaches were material and therefore, it cannot show that the purpose of either the franchise agreement or the branding contracts was frustrated.

The principal purpose of the parties' franchise agreement was to create a franchise relationship that gave defendant the right to sell plaintiff's gasoline.  For a period of fourteen years, plaintiff performed the contract without any complaints from defendant.  In the course of one year, plaintiff allegedly became an unreliable supplier of fuel; how unreliable,

40

defendant does not say.  It has submitted no evidence showing how much or to what degree plaintiff was in breach, making it impossible for a reasonable jury to find these alleged breaches "substantial."  Accordingly, I will grant plaintiff's request for summary judgment on defendant's affirmative defenses of impossibility of performance and frustration of purpose.

e.  Reimbursement schedule

Last, defendant argues that plaintiff is not entitled to damages on its claim regarding the branding agreements because the reimbursement payments plaintiff is claiming consitute an  improper penalty under Oklahoma law.  In Oklahoma, a contractual liquidated damages clause such as the reimbursement schedule is void if it constitutes a penalty.  Sun Ridge Investors, Ltd. v. Parker, 956 P.2d 876, 877 (Okla. 1998); see also Okla St. Ann. tit. 15, § 213 (2009).  In deciding whether a liquidated damages clause is a penalty, the court considers whether "1) the injury caused by the breach [is] difficult or impossible to estimate accurately; 2) the parties [] intend[ed] to provide for damages rather than for a penalty; 3) the sum stipulated [is] a reasonable pre-breach estimate of the probable loss."  Sun Ridge Investors, 956 P.2d at 878.  The amount of liquidated damages will be upheld if it is not an excessive amount. McQueen, Rains & Tresch, LLP v. Citgo Petroleum Corp., 195 P.3d 35, 46-47 (Okla. 2008).

The liquidated damages clause in the branding agreements provides for a repayment

41

of advances made by plaintiff in the form of allowance payments and branding materials.  In calculating the amount owed to plaintiff, the branding agreements require the repayment of all "allowance payments" as well as the costs incurred in branding the location minus the depreciation "based upon the straight line method over 60 months from the Effective Date." Dkt. #99-2. 99-2, Exh. B.  It is undisputed that plaintiff advanced $3,878,177.40 to defendant under the 39 branding agreements.  Plaintiff is seeking damages in the amount of $3,071.147.08, which represents the unearned portion of the allowance payments and branding materials.

Defendant agreed to the reimbursement schedule set out in the branding agreements on 39 different occasions.  It entered into the agreements knowingly and willingly.  It incurred no liability for entering into these branding agreements, received the benefit of being branded by plaintiff and earned rebates for maintaining plaintiff's brand.  The parties' liquidated damages clause is not a penalty bur a means of reimbursing plaintiff for the capital it expended in branding defendant's gas stations.  The clause is a reasonable pre-breach estimate of damages:  it seeks repayment for damages determined by the amount of time defendant maintained the gas stations under plaintiff's brand.  In other words, the amount of damages is reduced if defendant met its obligations and kept the location branded for the requisite life of the contract.  The clause requires only that defendant pay for the unearned advances made to it.  Plaintiff is not required to prove the exact nature of its damages,

42

although it could do so.  McQueen, Rains & Tresch, 195 P.3d at 46 (rejecting argument that liquidated damages is penalty unless "the amount denominated as liquidated damages [can] be related to the damages actually suffered at the time of the breach").  I conclude that the liquidated damages clause is valid and enforceable.  As a matter of law, plaintiff is entitled to damages in the amount of $3,071,147.08 for defendant's breach of the 39 branding agreements.

## C. Defendant's Fuel Supply Counterclaim

### 1. Waiver of claims

Defendant signed the 2005 amendment to the franchise agreement.  Plaintiff takes the position that the signing amounted to a waiver of defendant's right to recover on its undersupply claim, but it cites no Oklahoma case law to support its waiver theory.  Under Oklahoma law, a party may waive its right to breach of contract by conduct or acts that indicate an intention to relinquish its rights.  Hidalgo Properties, Inc. v. Wachovia Mortgage Co., 617 F.2d 196, 199 (10th Cir. 1980).  Plaintiff has identified no conduct that demonstrates defendant's intention to waive its right to sue for the alleged undersupply.  The 2005 amendment to the franchise agreement involved a reduction of the minimum amount of gasoline defendant was required to purchase each month.  It did not address any of the parties' past actions or express or imply a waiver by defendant of its right to pursue plaintiff's

43

liability for past events.

Under the UCC, a party does not waive its right to damages for past breaches by accepting future installments. To the contrary, a buyer can bring an action for past breaches while maintaining the current installment contract. U.C.C. § 2-613(3). Plaintiff's motion for summary judgment on defendant's counterclaim for damages resulting from undersupply will be denied.

2. <u>Damages claim</u>

Plaintiff contends that it is entitled to summary judgment as to the measure of damages on defendant's counterclaim, even if it is not entitled to summary judgment as to the claim itself. Plaintiff argues that under the UCC and Oklahoma law defendant is entitled to damages only for the installments that were non-conforming as a result of plaintiff's failure to supply and not for shortages that were excused under the allocation provision of the parties' franchise agreement. Plaintiff seeks to preclude defendant from seeking damages for de-branding and re-branding, lost opportunity costs, lost opportunity costs as a result of de-branding and lost growth following de-branding.

In response, defendant takes the position that it is entitled to damages that go beyond "cover" damages for alleged fuel undersupply in 2005 because plaintiff undermined the value of the parties' relationship by violating the security of fuel supply. Specifically, defendant

44

states, "[i]f that security disappears, the value of the franchise is destroyed and the franchisee is compelled to leave the brand." Dft.'s Br., dkt. #118-2, at 19. Although I addressed this issue in the context of the parties' discovery dispute in an order issued on June 23, 2009, it bears further explanation.

The question is whether the Petroleum Marketing Practices Act bars defendant's breach of contract claim. Nothing in the Act expressly preempts the claim, but the Act is the exclusive remedy for wrongful non-renewal of a franchise agreement governing petroleum purchases. As the Court of Appeals for the Seventh Circuit has held, a termination or a nonrenvewal within the meaning of the Act occurs when the action of a franchisor "terminated or discontinued any of the three statutory components of the franchise agreement, which include the contract to use the refiner's trademark, the contract for the supply of motor fuel, [and] the lease of the premises, or that the assignment of the franchise was made in violation of state law." Dersch Energies, Inc. v. Shell Oil Co., 314 F.3d 846, 859 (7th Cir.2002) (citing Beachler v. Amoco Oil Co., 112 F.3d 902, 906 (7th Cir. 1997)). Defendant's claim of entitlement to consequential damages for de-branding because plaintiff became a "unreliable fuel supplier" is encompassed by the Act because it concerns both the supply of motor fuel and the use of plaintiff's trademark. Characterizing this claim for damages as one for breach of contract does not change the fact that the claim can be brought only under the Petroleum Marketing Act.

45

Under Oklahoma law, the amount of damages recoverable for a breach of contract is "the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."  Okla. St. Ann. tit. 23, § 21 (2009); see also Sun Ridge Investors, 956 P.2d at 878.  It is not simply the amount that will make the party "whole," as defendant argues. "The time-honored general rules on recovery of damages for breach of contract are found in Hadley v. Baxendale, . . . rules [the Oklahoma supreme court] has generally followed." Florafax Intern., Inc. v. GTE Market Resources, Inc., 933 P.2d 282, 292 (Okla. 1997); see also Coker v. Southwestern Bell Tel. Co., 580 P.2d 151, 153 (Okla. 1978).  The rule set forth in Hadley v Baxendale is the following:

> Where two parties have a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, i. e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it.

Coker, 580 P.2d at 153 (citing Hadley v. Baxendale, 9 Ex. 341, 156 Eng. Rep. 145 (1854)).

Damages for de-branding, re-branding, lost profits and lost opportunities do not flow naturally from plaintiff's undersupply.  It is not a foreseeable consequence that failing to provide the required amount of gasoline in limited instances would cause the destruction of the parties' franchise agreement.  If defendant had thought that the failure to supply fuel in

46

the exact amount demanded by the parties' franchise agreement would threaten the existence of its business, the likelihood is that it would have sought more stringent provisions to protect its ability to receive the proper amount of fuel.  The natural and reasonable damages stemming from plaintiff's breach in this case would include but not be limited to the amount of money defendant had to spend to purchase additional gasoline, otherwise known as cover; the amount of lost sales during that time period; and any additional obligations defendant undertook when seeking cover for the undersupply.  Defendant is not entitled to damages resulting from the loss of plaintiff's brand.


D. Attorney Fees and Prejudgment Interests

Plaintiff has moved for attorney fees and prejudgment interest as the prevailing party on its breach of contract claims.  Defendant has raised no objection.  Generally, a failure to oppose an argument operates as a waiver.  Wojtas v. Capital Guardian Trust Co., 477 F.3d 924, 926 (7th Cir. 2007) (holding that plaintiff had waived right to challenge defendant's assertion of statute of limitations defense by failing to oppose defendant's argument in response to motion to dismiss); Cincinnati Insurance Co. v. Eastern Atlantic Insurance Co., 260 F.3d 742, 747 (7th Cir. 2001).  However, defendant asked the court to deny plaintiff's motion for summary judgment on both attorney fees and prejudgment interest on the assumption that plaintiff would not prevail.  Rather than award fees or interests at this time,

47

without a full briefing of the issue, I will deny plaintiff's request for summary judgment as premature and allow the parties to address the matter after trial has been held on the parties' remaining claims.

ORDER

IT IS ORDERED that

1. Plaintiff Citgo Petroleum Corporation's motion to strike the errata testimony of defendant Ranger Enterprise Inc.'s 30(b)(6) witnesses, Daniel Arnold and Frank Louis, dkt. #130, is GRANTED; its motion to strike the errata testimony of witness John Carabelli is DENIED; as a sanction, defendant will not be permitted to adduce any evidence of undersupply during the second quarter of 2005 and it will be required to reimburse plaintiff for fees and costs incurred in bringing the motion to strike;

2. Plaintiff's motion to strike the supplemental expert report of Jeffrey Bernard, dkt. #144, is GRANTED;

3.  Defendant's motion for leave to supplement the record with the expert reports of Kevin Murphy, Joseph Leto and Dileep Sirur, dkt. #166, is GRANTED;

4. Defendant's motion to strike portions of Dileep Sirur's expert report, dkt. #165, is GRANTED with respect to ¶¶13-22;

5. Defendant's motion for leave to allege an additional affirmative defense, dkt. #173,

48

is DENIED;

6. Plaintiff's motion for summary judgment, dkt. #95, is GRANTED on the following claims:

- Defendant breached the parties' franchise agreement by failing to purchase the required monthly minimum quantity of fuel between January and July, 2006;

- Defendant breached the parties' branding agreements for 39 stores located in Wisconsin, Illinois and Indiana and will be awarded $3,071,147.08 in damages; and

- Defendant is not entitled to damages for de-branding and re-branding, lost opportunity costs and lost growth on its counterclaim that plaintiff failed to supply the required gasoline allotments due under the franchise agreement in 2005.

7. Plaintiff's motion is DENIED with respect to its contention that defendant waived its counterclaim for fuel supply breaches in 2005;

8. Plaintiff's request for attorney fees and prejudgment interest is DENIED as premature. Plaintiff may bring a motion for attorney fees and prejudgment interest after the close of trial.

9. The case will proceed to trial on the following claims:

- The measure of plaintiff's damages for defendant's breach of the franchise

49

agreement by failing to purchase the required amounts of fuel; and

•       Whether plaintiff breached the party's franchise agreement by undersupplying

        defendant in 2005 and if so, the measure of defendant's damages resulting

        from plaintiff's breach.

Entered this 9th day of July, 2009.

                        BY THE COURT:

                        /s/
                        _____

                        BARBARA B. CRABB
                        District Judge

50